UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| JOHN SEMPLE, | ) | CIV.  06-5056-AWB |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **MEMORANDUM OPINION** |
| | ) | |
| FEDERAL EXPRESS CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |


Defendant in the above-captioned matter has filed a motion for summary

judgment.  Docket 46.  Plaintiff has responded to this motion.    Docket 52.

For the reasons stated below, the motion for summary judgment is granted.

**BACKGROUND**

Here are the relevant facts, viewed in the light most favorable to Plaintiff:

Plaintiff was hired by Federal Express Corporation (FedEx) in 1990.  At

that time, he signed an employment contract that included the following

statement:

> I do hereby agree . . . (11) That during the time of my employment,
> which term I understand is indefinite, I will comply with the
> guidelines set forth in the Company's policies, rules, regulations and
> procedures . . . I ALSO AGREE THAT MY EMPLOYMENT AND
> COMPENSATION CAN BE TERMINATED WITH OR WITHOUT CAUSE
> AND WITHOUT NOTICE OR LIABILITY WHATSOEVER, AT ANY TIME,
> AT THE OPTION OF EITHER THE COMPANY OR MYSELF.

Docket 49-2 (capitalization in original); Docket 48 ¶ 1.  Plaintiff signed this

contract below the statement:  "I HAVE READ AND UNDERSTAND THIS

AGREEMENT."  Docket 49-2.  Throughout his time at FedEx, Plaintiff verified

by his signature that he received at least three different employee handbooks

from his employer.  Regarding the handbook he received in 1990, Plaintiff

signed a record of receipt which stated: "I understand [the handbook] is not a

contract and the information provided may need to be changed by the company

from time to time."  Docket 49-3; Docket 48 ¶ 3.  Plaintiff signed similar

records of receipt in June 1997 and February 2002 certifying he had received a

copy of the employee handbook.  Docket 49-4, 49-5.  That same signature

certifies that Plaintiff read and understood an accompanying statement which

expresses that the handbook is not a contract of employment, that the

handbook should not be read or implied to create a contract, that an

employee's rights are governed by the employment contract and not the

handbook, that the handbook "contains guidelines only," and that FedEx

reserves the right to modify the publication and its policies at any time.  Id.

Those portions of the employee handbook which are relevant to the

events here include Section 2-5 which discusses "Acceptable Conduct."  Docket

52-4, page 2-3.  Section 2-5 defines "Misconduct" and includes a list that "is

not all-inclusive" of types of misconduct which are to be investigated and

documented.  Id. at 2.  Section 2-5 also discusses the process for

investigative/disciplinary suspensions and warning letters.  Under the

subheading "Discharge Offense," the policy reads:  "An employee is dismissed

upon completion of an investigation confirming violations related to . . .

2

Deliberate falsification of Company documents including but not limited to . . . delivery records." Id. at 3.  The subsection "Discharge Approval" states that "[t]wo levels of line management and a matrix Human Resources staff member must approve all discharges based on misconduct when the individual holds a managing director or below position." Id. at 5.

The handbook also includes Section 4-90 "Termination," which is almost entirely made up of a subsections entitled "Guidelines" and "Employment Termination Chart." Id. at 8-12.  Within the Guidelines portion, a subsection labeled "Employment at Will" states the following:

> The employment relationship between the Company and any employee may be terminated at the will of either party as stated in the employment agreement signed upon application for employment. As described in that agreement, the policies and procedures set forth in this manual provide guidelines for management and employees during employment, but do not create contractual rights regarding termination or otherwise.

Id. at 8.  Within the Employment Termination Chart, a subheading labeled "Discharge – Involuntary termination of employment initiated by the Company" discusses the Approval process for three types of violations, "Acceptable Conduct Violation . . . Alcohol and Drug-free Workplace Violation . . . [and] Performance Improvement Violation." Id. at 11.  For Acceptable Conduct violations, the chart reiterates the earlier policy that two levels of line management and a Human Resources staff member must approve all discharges of managing directors and lower positions.

3

Section 5-55 of the handbook discusses FedEx's anti-harassment

policies.  It provides:

> FedEx Express condemns any acts in its work environments that
> create the potential for illegal harassment, both in terms of individual
> employee morale and in violation of applicable federal, state, and
> local laws.   The Company will not tolerate harassment of any
> employee because of that employee's sex, sexual orientation, gender,
> race, color, religion, national origin, age or disability.

Id. at 21.  Again, the majority of Section 5-55 falls under the "Guidelines"

subheading, which includes a "Definition" portion stating, "This policy

prohibits all inappropriate language and conduct – regardless of whether that

behavior would legally constitute 'harassment.'" Id.  Prohibited conduct

includes "any inappropriate action or conduct that might be viewed as

harassing behavior." Id. at 22.  The policy directs an employee who feels he

or she has been harassed to report such to a member of management.

Finally, the policy prohibits retaliation against an employee who reports an

incident of "sexual or other harassment." Id.

The remaining relevant part of the employment handbook discusses the

Guaranteed Fair Treatment Procedure (GFTP) and the EEO Complaint Process.

Id. at 13-20.  This complaint process is FedEx's "procedure for handling

employee complaints, problems, concerns, and allegations of employment

discrimination" and is available to all employees "who receive discipline,

including termination, or treatment that they believe to be unfair." Id. at 13.

Plaintiff was originally hired in 1990 as a handler at FedEx's branch in

Sioux City, Iowa.  He advanced through several positions at FedEx, eventually becoming a Manager at the Rapid City facility.  Plaintiff resigned from that position in early 2004 and was reassigned to a courier position.  A few months later, Rick Byrd was promoted to the Operations Manager position at the Rapid City FedEx office.  Ryan Ruble became Senior Manager of FedEx's Rapid City facility in June 2004.  At this time, Linda Sokolik was the Managing Director of domestic ground operations for the Northland District of FedEx.  Finally, Julie Hass was the FedEx human resources representative whose coverage area included Rapid City.

In 2004, Plaintiff said that Byrd called him at home and made disparaging comments about Plaintiff's sleep disorder and the medication he was prescribed for this condition.  In 2005, Plaintiff submitted to Byrd and Ruble a written complaint against a FedEx dispatcher.  Plaintiff states that he was informed he could file a formal complaint, but that he does not recall either Byrd or Ruble talking with him further about this complaint.  In August 2005, that same dispatcher completed a report against Plaintiff for an alleged break violation.  Plaintiff talked about the report with Byrd, after which Plaintiff believed the situation was resolved.  However, a short time later, Ruble and Byrd called Plaintiff into a meeting where the two managers discussed a written memo they had written to Plaintiff which included three "Counseling Performance Expectations," including this alleged break violation.  Plaintiff

states that the meeting was "'harassing' and 'combative,'" and that Ruble personally insulted him during this meeting.  Docket 52, page 3.

After the meeting, Plaintiff then filed a complaint with Sokolik through FedEx's "Open Door" policy.  In response, Sokolik sent a memo to all parties involved which included her conclusion that a break violation had not occurred and the promise that she would tell Byrd to remove the break compliance notation from Plaintiff's file.  Plaintiff contends that the original document which included the break violation was never removed from his file.

Plaintiff also spoke with Byrd several times regarding a delay in receiving his paycheck, during which time Byrd indicated that Plaintiff would probably bring a lawsuit over the conflict.  Additionally, Plaintiff heard from other FedEx employees that Byrd had spoken "negatively or maliciously" about Plaintiff.  Id. at 5.  For example, Byrd allegedly told another employee that his goal was to fire Plaintiff.   Also in 2005, Byrd gave Plaintiff several positive evaluations in relation to performance reviews and checkrides.

In September 2005, Plaintiff sent Hass a formal harassment complaint against his supervisors Ruble and Byrd, sending Sokolik a copy as well.  In this complaint, Plaintiff listed as examples of this harassment the August 2005 incident regarding the alleged break violation, a more recent incident involving a scratch on his vehicle's front bumper, a scheduling conflict, the problems described above regarding Plaintiff's payroll check, and allegations that Byrd had said unprofessional things about Plaintiff to other employees.  See Docket

6

49-34.  FedEx's Human Resources Compliance Department in Memphis, Tennessee, reviewed Plaintiff's compliant and returned it to Northland District personnel once they determined that Plaintiff's complaints were not covered by any EEO law.  Docket 49-35.  Sokolik and Hass discussed the investigation of Plaintiff's complaints, and the parties dispute whether either of these individuals ever spoke to Plaintiff about his harassment complaint.  Hass later communicated with Plaintiff via email in September 2005 about the harassment allegations and met with him in October 2005 regarding his complaint.  However, contends Plaintiff, his complaint "does not appear to have been taken seriously by his supervisors," and he never received any "formal, written response" or similar indications that anyone conducted an investigation of his complaint.  Docket 52, page 6.

In October 2005, Byrd asked FedEx security officer Matt Heggenberger to investigate a missing Dell computer which, according to FedEx records, Plaintiff allegedly delivered to the wrong address.  On October 25, 2005, Heggenberger emailed Byrd and Ruble, stating that he had discovered 26 "questionable signature releases" attributable to Plaintiff in the past three months which were similar to the Dell computer situation.  A short time later, Ruble spoke with Heggenberger on speaker phone in the Plaintiff's presence, and for forty minutes Heggenberger and Ruble interrogated Plaintiff about allegations that he was releasing packages without an authorized release. Plaintiff denied all allegations.  A few days later, Heggenberger closed the

7

investigation, concluding that there was "no conclusive evidence that a policy was broken." Id. at 8.  However, Plaintiff claims that Heggenberger never told him that the investigation was closed, and it was ultimately determined that the missing Dell computer was actually delivered to the proper address.

From October 21 to November 4, 2005, Byrd was in Memphis for FedEx training sessions.  On October 24, 2005, Ruble overheard a conversation between Plaintiff and a dispatcher where Plaintiff stated that had six international packages in his truck which were not supposed to be there, and that the delivery of these packages would be late.  After overhearing this conversation, Ruble reviewed plaintiff's delivery records for this day, completing a "route trace" on Plaintiff's route, which indicated the following:

> Semple had made a delivery to 2460 Deadwood Avenue at 10:15; then at 3600 Universal Drive at 10:20; then a delivery at 2090 Deadwood Avenue at 10:27; then back to 2460 Deadwood Avenue at 10:30; and then the 44-minute gap until the next delivery, which was at 10303 Quall Road at 11:14.

Id. at 9.  When these delivery times seemed longer than Ruble believed was justified, he expanded his investigation to include Plaintiff's previous delivery records related to 2090 Deadwood and 2460 Deadwood, finding that delivery times ranged from thirteen to six minutes to travel the .34 miles between the two locations.[1]  Ruble then prepared written questions for Plaintiff based upon

---

[1]  Initially, Plaintiff denies Defendant's Statement of Facts ¶ 45 that Ruble looked into delivery records regarding these two addresses on Deadwood Avenue, stating that "[i]t is not clear what Ruble was looking at in his investigation."  Docket 53 ¶ 45.  However, the Plaintiff later admits all of paragraph 47 of Defendant's Statement of Facts, which discusses the record of

his investigation.  In his written answers to these questions, Plaintiff wrote that he did not scan the package for 2460 Deadwood Avenue upon delivery, as required by FedEx's best practices; instead, he scanned the delivery two minutes prior to actually delivering the 2460 Deadwood Avenue package in order to meet the 10:30 a.m. deadline.  Plaintiff stated that he scanned the package early in order to "make service,"  Docket 49-47, and that he had never done this before.  Plaintiff states that Ruble does not know where Plaintiff was physically located when he scanned the package.

Ruble placed Plaintiff on investigative suspension on October 31, 2005. On November 3, 2005, Plaintiff was terminated from his employment with FedEx, and his termination letter stated that he was guilty of "'intentional and deliberate falsification' of Company documents." Id. at 12.  Plaintiff states that there is no evidence that Ruble obtained approval for this termination from two levels of line management, as required by FedEx policy.

Plaintiff utilized the GFTP/EEO process to appeal his termination, an appeal which included allegations that his termination was in retaliation for his harassment complaints against his supervisors.  FedEx interpreted these retaliation claims as EEO allegations and launched an internal investigation to explore the claims.  As part of this investigation, Hass asked Ruble for other instances where couriers were notified in writing of late deliveries, and Plaintiff

---

deliveries to these two locations.  Thus, the Court accepts as admitted the fact that Ruble's investigation of Plaintiff's record of deliveries includes those deliveries to 2090 Deadwood and 2460 Deadwood.

also gave additional materials to Hass for her investigation, including additional harassment complaints he had submitted to Hass and Sokolik and an additional statement he drafted for the GFTP.  On January 6, 2006, FedEx notified Plaintiff that the EEO investigation had been completed, and it had found no violation.  Regarding Plaintiffs' GFTP review, Plaintiff met with Sokolik, Ruble, and Byrd in Rapid City, with Hass on the phone.  After this meeting, Sokolik upheld the termination.  Plaintiff appealed to the Step II official, who upheld the termination.  Plaintiff appealed to the Step III Appeals Board, which also upheld the termination.  Regarding the reason for his termination, Plaintiff alleges that various FedEx employees offer different justifications for his firing, including those who must approve the termination under FedEx policy.  Finally, in his reply brief, Plaintiff offers examples of other FedEx employees who supposedly falsified a delivery but were not terminated but merely disciplined, demonstrating that "termination does not automatically flow from an allegation of falsification of records."  See Docket 52, page 16.

Plaintiff filed this lawsuit on July 19, 2006.  After both parties had conducted discovery, Defendant filed a motion for summary judgment, arguing that South Dakota law forecloses Plaintiff's case because he was an employee at will, and because his termination did not violate any federal or state law. Plaintiff contends that an exception to the employment-at-will doctrine applies here, and thus he should be allowed to seek redress for wrongful discharge.

## STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  In determining whether summary judgment should issue, the facts and inferences from those facts are viewed in the light most favorable to the nonmoving party, and the burden is placed on the moving party to establish both the absence of a genuine issue of material fact and that such party is entitled to judgment as a matter of law.  Id.; Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).  Once the moving party has met this burden, the nonmoving party may not rest on the allegations in the pleadings, but by affidavit or other evidence must set forth specific facts showing that a genuine issue of material fact exists.  In determining whether a genuine issue of material fact exists, the Court views the evidence presented based upon which party has the burden of proof under the applicable substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

## DISCUSSION

S.D.C.L. § 60-4-4 provides: "An employment having no specified term may be terminated at the will of either party on notice to the other, unless

otherwise provided by statute."  South Dakota courts have recognized three
narrow exceptions to this general rule.

> Employees may be terminated at-will in South Dakota, except for (1)
> terminations that contravene public policy, (2) employees with
> express 'for cause only' agreements or implied 'for cause only' cases
> where an employee handbook contains a detailed list of exclusive
> grounds for discharge and a mandatory specific procedure the
> employer agrees to follow, or (3) an employee who accepted
> employment after being promised future promotion to a certain
> position.

Bass v. Happy Rest, Inc., 507 N.W.2d 317, 321 (S.D. 1993) (citations omitted).
Plaintiff acknowledges that he is an at-will employee under the terms of
S.D.C.L. § 60-4-4.  However, he argues that he falls within exception 1, or
alternatively that he falls within exception 2, and thus is entitled to bring this
suit.  Docket 52.

**Public Policy Exception**

The South Dakota Supreme Court recognized a "narrow" public policy
exception to the employment-at-will doctrine in Johnson v. Kreiser's, Inc., 433
N.W.2d 225, 227 (S.D. 1988).  That court first defined this exception in this
way:

> An employee has a cause of action for wrongful discharge when the
> employer discharges him in retaliation for his refusal to commit a
> criminal or unlawful act.  It is repugnant to public policy to expect an
> employee to commit such acts in order to save his job.  Consequently,
> we carve out this exception to the at-will doctrine codified at SDCL
> 60-4-4. . . . [W]e leave the statutory at-will doctrine intact, subject
> only to this narrow public policy exception and our holdings . . .
> regarding employee handbooks and . . . . regarding an employer's oral
> representations.

12

Id. at 227-28.  To avoid frivolous lawsuits by disgruntled employees fired for valid reasons, the South Dakota Supreme Court placed the burden on the employee to prove "that the dismissal violates a clear mandate of public policy." Id. at 227.  See also Niesent v. Homestake Mining Co. of Calif., 505 N.W.2d 781, 783 (S.D. 1993) ("To state a cause of action under this exception, the employee must plead and prove that a substantial public policy may have been violated").  "Whether the act complained of violates a clear mandate of a substantial public policy is a question of law."  Niesent, 505 N.W.2d at 783.  Further, public policy is to be found "in the letter or purpose of a constitutional or statutory provision or scheme, or in a judicial decision."  Id.

In Johnson, the plaintiff was an accountant at the defendant company who argued that he was fired solely because he refused to allow defendant's president to convert corporation property for his own personal use.  Johnson, 433 N.W.2d at 226.  After reviewing caselaw from other jurisdictions, the South Dakota Supreme Court was persuaded to recognize for the first time a public policy exception to the at-will doctrine.  Since Johnson, that court has considered several cases where plaintiffs have claimed similar protection under public policy, but it has utilized this exception only rarely, always stating that it is to be interpreted narrowly.  See Dahl v. Combined Ins. Co., 621 N.W.2d 163, 167 (S.D. 2001) (applying public policy exception to whistleblower fired because he was forced to choose between reporting missing insurance premiums to state authorities or keeping his job); Niesent, 505 N.W.2d at 783

13

(holding that the public policy exception permits action when employer retaliates against employee who files a worker's compensation claim). <u>Cf.</u> <u>Bass</u>, 507 N.W.2d at 321 (refusing to recognize public policy that employers treat employees decently for purpose of the exception); <u>Peterson v. Glory House of Sioux Falls</u>, 443 N.W.2d 653, 655 (S.D. 1989) (refusing to extend public policy exception to include employee fired for warning a client about the improper sexual conduct of another employee because it did not involve a criminal or unlawful act). <u>See also</u> <u>Lau v. Behr Heat Transfer Sys., Inc.</u>, 150 F. Supp. 2d 1017, 1022-23 (D.S.D. 2001) (utilizing the public policy exception against employer who fired employee in retaliation for asserting rights under the Family Medical Leave Act); <u>Meyers v. Amer. States Ins. Co.</u>, 926 F. Supp. 904, 911  (D.S.D. 1996) (refusing to recognize that S.D.C.L. § 60-2-8 establishes a duty of loyalty which, when violated, falls within the public policy exception; refusing to recognize a whistleblower exception when it does not involve illegal or criminal acts).

With regard to the public policy exception, Defendant argues that even if Plaintiff's allegations are true – that he was fired for filing an internal grievance regarding harassment by his supervisors – this is not a clear violation of a substantial public policy and thus the public policy exception to the at-will doctrine does not apply.  Plaintiff argues that South Dakota public policy prohibits a retaliatory firing for filing an internal grievance.  Pointing to the FedEx employment manual, which prohibits any form of harassment – not just

14

harassment which falls within the parameters of federal or state law – the Plaintiff seems to state that the public policy behind anti-retaliation laws in the context of Title VII harassment claims would be violated if retaliation were permitted in the context of non-Title VII harassment claims.  "Therefore, if Semple can prove that his termination was in retaliation for his harassment complaint, in violation of the [employment manual's] stated policy, he will also prove that the retaliatory discharge violated South Dakota public policy."  Docket 52, page 22.

The Court is not persuaded that a termination in retaliation for an internal complaint of harassment violates a "clear mandate of a substantial public policy," as required for the public policy exception to apply.  See Niesent, 505 N.W.2d at 783.  As stated above, the primary sources of public policy are constitutions, statutes, and judicial decisions.  The Court does not believe that the public policy Plaintiff is claiming – anti-retaliation policy borrowed from employment discrimination statutes – is indeed a "clear mandate" but instead can only arise from a distorted interpretation of existing state law.  Simply, South Dakota has not outlawed retaliatory firings for filing an internal grievance of general harassment, and this Court refuses to create such a public policy here.  Further, this Court's review of South Dakota law demonstrates that the South Dakota Supreme Court would not adopt such a broad approach to the public policy exception which it has repeatedly described as narrow.  In the name of protecting the integrity of the at-will doctrine codified by the

15

legislature, the South Dakota Supreme Court has withheld the benefit of the public policy exception from employees who seem to have been wronged unjustly by their employers, refusing to extend the exception to conduct does not violate a clear mandate of public policy.  See, e.g. Bass, 507 N.W.2d at 321 (affirming summary judgment for Defendant when employee claimed that employer refused to provide health insurance or worker's compensation, fired her after she was injured, and canceled her private health insurance which employee paid herself); Peterson, 443 N.W.2d at 655 (refusing to impose an implied covenant of good faith and fair dealing upon employment contracts and enforcing the at-will statutory provision) (citing Breen v. Dakota Gear & Joint Co., Inc., 443 N.W.2d 221, 224 (S.D. 1988)).

Finally, the Court does not believe Plaintiff can claim any protection as a whistleblower under this public policy exception.  The South Dakota Supreme Court has stated quite clearly that "only whistleblowing which promotes the public good is protected by the public policy exception.  This exception cannot be invoked by employees to primarily protect their proprietary interests, exact revenge on an employer, or for personal gain."  Dahl, 621 N.W.2d at 167 (looking to the public policy behind encouraging "the reporting of unlawful or criminal conduct" in applying exception to employee who reported illegal conduct to authorities).  See also Anderson v. First Century Fed. Credit Union, 738 N.W.2d 40, 46 (S.D. 2007) (defining whistleblowing as "the reporting of criminal or unlawful activity to superiors or outside agencies").  Here, the

16

harassment complaint clearly did not implicate any criminal or unlawful activity, but instead addressed conduct which allegedly violated company policy.  Significantly, the supposed whistleblowing was performed not for the public good but for the Plaintiff's own benefit.  Plaintiff filed the internal grievance for his own gain – to enable him to better complete his job responsibilities – not for any purpose to serve FedEx's customers or the broader public.  Even assuming that Plaintiff filed the grievance out of the purest intentions, the purpose of grievance was still to resolve conflicts between himself and his supervisors, and a successful resolution of the complaint would not in any way have a direct, positive effect on the public. Since Plaintiff would not qualify as a whistleblower under even a very expansive view of that protection, the public policy exception of the at-will doctrine does not apply.

**Employee Handbook Exception**

Plaintiff also claims that the Court should apply the employee handbook exception to the at-will doctrine and hold that FedEx's handbook created an implied contract that he would only be fired for cause.  The ability of an employer to abandon its statutory rights to fire employees at will through its own employment policies was first recognized by the South Dakota Supreme Court in Osterkamp v. Alkota Mfg., Inc., 332 N.W.2d 275, 277 (S.D. 1983).  A few years later, that court further refined the handbook exception, stating:

> [Osterkamp] indicates two possible ways that language in an employee handbook can be construed as creating a discharge "for cause only" agreement.  First, such an agreement may be found where the handbook explicitly provides, in the same or comparable language, that discharge can occur "for cause only."  Second, a "for cause only" agreement may be implied where the handbook contains a detailed list of exclusive grounds for employee discipline or discharge and, a mandatory and specific procedure which the employer agrees to follow prior to any employee's termination.  In short, the handbook must contain language indicating a clear intention on the employer's part to surrender its statutory power to terminate its employees at will.

Butterfield v. Citibank of South Dakota, 437 N.W.2d 857, 859 (S.D. 1989) (citations omitted).  When, by express or implied contract, an employer commits to follow a for-cause termination procedure, an employee who has been terminated may have a cause of action if the employer fails to follow the specified termination procedure.  Holland v. FEM Elec. Assoc., Inc., 637 N.W.2d 717, 721 (S.D. 2001).

Defendant argues that its employee handbook is neither an express or implied resignation of its statutory right to fire employees at will.  While Plaintiff does not contend that Defendant's employment manual explicitly states that termination is only for cause, he does argue that a for-cause agreement is implied within the terms of the handbook.  Plaintiff acknowledges that FedEx employment materials include explicit language regarding the at-will nature of employment and FedEx's right to terminate employment for any reason.  However, Plaintiff also states that FedEx in its employment manual impliedly limited its ability to terminate at will by including a specific

18

termination procedure as well as an exclusive list of the conduct which could lead to termination.  When these statements of self limitation are read in combination with the express at-will language in the employment contract, contends Plaintiff, an ambiguity arises which should be construed against the drafter, FedEx.  Finally, argues Plaintiff, the existence of an implied contract is a question of fact which should survive this motion and be presented to a jury.

The Court does not believe that FedEx's employment manual includes a "a clear intention on the employer's part to surrender its statutory power to terminate its employees at will," which the South Dakota Supreme Court has stated is a necessary component of an implied surrender of at-will rights. Butterfield, 437 N.W.2d at 859.  First, Plaintiff's employment contract includes explicit language that his employment could be terminated "WITH OR WITHOUT CAUSE AND WITHOUT NOTICE OR LIABILITY WHATSOEVER, AT ANY TIME, AT THE OPTION OF EITHER THE COMPANY OR MYSELF."  Docket 49-2 (capitalization in original).  Second, Plaintiff signed a receipt form certifying that he received periodic copies of FedEx's employment manual; that receipt form stated that the handbook is not a contract and that the company reserves the right to change the information within the manual at its discretion.  Docket 49-3, 49-4, 49-5.  Two of such receipts signed by Plaintiff stated that the handbook should not be read or implied to create a contract and that the handbook "contains guidelines only," stating that "[y]our specific rights as an employee are governed by the Employment Agreement you signed

19

in your employment application." Docket 49-4, 49-5.  Finally, the employment

manual itself in Policy 4-90 Termination states:

> The employment relationship between the Company and employee
> may be terminated at the will of either party as stated in the
> employment agreement signed upon application for employment.  As
> described in that agreement, the policies and procedures set forth in
> this manual provide guidelines for management and employees
> during employment, but do not create contractual rights regarding
> termination or otherwise.

Docket 52-4.  These explicit reservations of FedEx's at-will termination power

as provided in S.D.C.L. § 60-4-4 conclusively contradict Plaintiff's contention

that FedEx clearly manifested an intent to abandon these statutory rights.  See

Aberle v. City of Aberdeen, 718 N.W.2d 615, 622 (S.D. 2006) (finding no implied

contract when employee handbook contained reservation of at-will power);

Butterfield, 437 N.W.2d at 859-60 (holding that employee was terminable at

will because handbook did not evince clear indication of intention to give up at-

will rights and because procedures were a "guide" and not mandatory).  Cf.

Hollander v. Douglas County, 620 N.W.2d 181, 185-86 (S.D. 2000) (finding

express promise to terminate for cause when employment contract restricted

authority of employer to terminate only "for disciplinary purposes" and when

employer did not expressly reserve to terminate at any time or for any reason).

The recent South Dakota Supreme Court case of Aberle v. City of

Aberdeen is highly persuasive in the immediate context.  There, the circuit

court considered both the "Standards of Employment" in the employment

contract and General Employee Policies manual, concluding that the City of

20

Aberdeen waived the statutory at-will presumption when it followed the policies and referred to the employment contract during Aberle's termination.  718 N.W.2d 615, 620 (S.D. 2006).  The circuit court reached this conclusion despite the clause in the manual that the city could terminate employment at any time. The South Dakota Supreme Court reversed, finding determinative the company's explicit reservation of its at-will power in the employment contract. Id. at 622-23.  Further, the court stated that the two documents relied upon by the circuit court "which carry Aberle's signature contain written and explicit terms of employment [] constitute an express contract as a matter of law concerning his at-will status."  Id. at 622.  Since part of the contract included the express reservation of the employer's at-will rights, the circuit court could not ignore such language and imply different terms. "[B]ecause an express contract existed as to at-will status under the two documents, an implied contract could not exist."  Id. (citing Jurrens v. Lorenz Mfg. Co. of Benson, Minn., 578 N.W.2d 151, 153 (S.D. 1998) (stating that a contract will be implied from the conduct of the parties only when the parties do not expressly agree to an explicit contract)).  Additionally, the South Dakota Supreme Court stated:

> A written employment contract may include both guidelines for employee conduct and behavior and an explicit reservation of the at-will power.  Such an explicit reservation does not require the use of any specific language, but it must clearly indicate that the employer reserves the right to fire an employee at any time when it deems discharge to be appropriate.

Id. at 622.

In Plaintiff's case here, the Court is unpersuaded by Plaintiff's attempt to use the comprehensive nature of FedEx's employee manual against it to find ambiguities and to argue that factual issues should survive to be heard by the jury. Just as in <u>Aberle</u>, FedEx explicitly reserved its at-will powers, both in the employment contract and in the employment manual, and the Plaintiff's signature on both the employment contract and the receipt of the employment handbook signifies that he acknowledged this at-will status. As in <u>Aberle</u>, FedEx's express reservation of its at-will power exists alongside guidelines for employee and employer conduct and behavior without diminishing the effect of FedEx's words that it can terminate employees at will.

Further, even if the Court were to ignore these express reservations of FedEx's statutory at-will rights, it does not believe that FedEx's handbook would meet the requirements of an implied contract to terminate only for cause.[2] The South Dakota Supreme Court in <u>Butterfield</u> laid out two requirements for such implied contracts: 1) a "detailed list of exclusive grounds

---

[2]   While Plaintiff is correct in stating that the existence of an implied contract is a question of fact, South Dakota courts can resolve the question of the existence of such an implied contract by summary judgment when "reasonable minds could not differ." <u>Van de Walle & Assoc. v. Buseman</u>, 665 N.W.2d 84, 87 (S.D. 2003) (citations omitted). "To determine whether reasonable minds could differ, we look to each element necessary to support an implied contract." <u>Id.</u> at 88. The Court does so here, concluding that no reasonable mind could interpret the employment manual in the way Plaintiff advocates and find an implied contract under a <u>Butterfield</u> analysis. Regardless, as this Court applies the <u>Aberle</u> ruling that there can be no implied contract when there is an express contract, the Court's finding that no implied contract actually existed is merely an alternate way to find that no exception to the at-will doctrine is available to Plaintiff.

for employee discipline or discharge," and 2) "a mandatory or specific

procedure which the employer agrees to follow prior to any employee's

termination."  437 N.W.2d at 859.  Here, neither of these prongs is met.  Policy

2-5 Acceptable Conduct includes a list of behaviors which constitute

misconduct, but FedEx twice states explicitly that the list is "not all-inclusive."

Docket 52-4, page 2.  Plaintiff argues that this list of Misconduct, along with

the dischargeable offenses discussed on the Employment Termination Chart,

combine to make an exclusive list of grounds on which to discipline employees.

See Docket 52-4, page 2, 11.  However, the Court is unpersuaded to read these

statements listed merely as "Guidelines" as creating such an exclusive list of

prohibited conduct in light of the non-exclusive label FedEx retains and the

absence of any language in the employment manual that indicates that

employees are assured of continued employment unless they engage in the

specified outlawed behavior.

Further, the employment handbook does not create a mandatory or

specific procedure the employer has committed to follow "prior to any

employee's termination."  Again, nearly all of the content of Policy 4-90

Termination falls within the "Guidelines" heading, a label which clearly

demonstrates the non-mandatory and advisory role of the policy.  Further, the

Court's reading of the guidance given in the policies convinces it that the

provisions are not mandatory but instead are to be used as a guide to help

supervisors discipline employees and to assist employees who are undergoing

23

discipline or termination.  See Butterfield, 437 N.W.2d at 860.  Additionally, the handbook does not contain any language with regard to the timing of the discharge procedures, nor any language which specifically provides that something be done prior to the employee's termination, as is required by Butterfield.  For these reasons, the Court does not believe that FedEx's manual meets the requirements for finding an implied contract to terminate for-cause only, and thus this exception to the at-will doctrine does not apply.

**CONCLUSION**

As the Court finds that Defendant has not surrendered its statutory right to terminate employees at will through its employment handbook, nor does any public policy prevent FedEx from terminating Plaintiff's employment, Plaintiff is an at-will employee under the laws of South Dakota.  Thus, Plaintiff does not have a cause of action for wrongful discharge.  Accordingly, summary judgment for Defendant is required.

For the reasons stated above, it is hereby

ORDERED that Defendant's motion for summary judgment, Docket 46, is GRANTED.

Dated this 17th day of April, 2008.

BY THE COURT:

/s/ Andrew W. Bogue

ANDREW W. BOGUE
SENIOR DISTRICT JUDGE

24